UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MAURICE ANTWAN HAYNES,

        Petitioner,

                                   CASE NO. 2:13-CV-10358

v.                              JUDGE LAWRENCE P. ZATKOFF
                                  MAGISTRATE JUDGE PAUL J. KOMIVES

DAVID BERGH,

        Respondent.[1]

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . 5
    C.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        2.    *Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        3.    *Exceptions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            a. Cause and Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            b. Actual Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    E.    *Evidence Claims (Claims I, II, and IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1.    *Prejudicial Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2.    *Right to Present a Defense (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        3.    *Hearsay and Confrontation (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    F.    *Prosecutorial Misconduct (Claims III, VI, X, and XI)* . . . . . . . . . . . . . . . . . . . . . . . . . 37
        1.    *Improper Comments and Questions (Claims III & VI)* . . . . . . . . . . . . . . . . . . . . . 37
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        2.    *Comment on Silence (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        3.    *Perjury/Witness Intimidation (Claims X & XI)* . . . . . . . . . . . . . . . . . . . . . . . . . 48

[1]By Order entered this date, David Bergh has been substituted in place of Paul Klee as the proper respondent in this action.

|  |  | a. Clearly Established Law | 48 |
|  |  | b. Analysis | 50 |
| G. | *Fair Cross Section (Claim V)* | | 51 |
|  | 1. | *Clearly Established Law* | 51 |
|  | 2. | *Analysis* | 51 |
| H. | *Sufficiency of the Evidence (Claim VIII)* | | 53 |
|  | 1. | *Legal Standard* | 53 |
|  | 2. | *Analysis* | 54 |
| I. | *Newly Discovered Evidence/Actual Innocence (Claims VII & X)* | | 57 |
| J. | *Ineffective Assistance of Counsel (Claim IX)* | | 58 |
|  | 1. | *Clearly Established Law* | 58 |
|  | 2. | *Analysis* | 61 |
| K. | *Recommendation Regarding Certificate of Appealability* | | 61 |
|  | 1. | *Legal Standard* | 61 |
|  | 2. | *Analysis* | 63 |
| L. | *Conclusion* | | 64 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS | | 64 |

\*     \*     \*     \*     \*

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.    <u>REPORT</u>:

A.    *Procedural History*

1.    Petitioner Maurice Antwan Haynes is a state prisoner, currently confined at the Thumb Correctional Facility in Lapeer, Michigan.

2.    On September 17, 2007, petitioner was convicted of second degree murder, MICH. COMP. LAWS § 750.317; felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; carrying a concealed weapon, MICH. COMP. LAWS § 750.227; and two counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Saginaw County Circuit Court. On November 1, 2007, he was sentenced as a second habitual offender, MICH. COMP. LAWS § 769.10, to concurrent terms of 39-75 years' imprisonment on the murder conviction and 47-90 months' imprisonment on each of the concealed weapon and felon in possession convictions, all consecutive to a mandatory term of two years' imprisonment on the

felony-firearm convictions.

      3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through

counsel, the following claims:

    I.    THE TRIAL COURT ERRED AND DEPRIVED MR. [HAYNES] OF A FAIR TRIAL WHEN IT PERMITTED THE PROSECUTION TO PLAY THE VIDEOTAPE OF MR. HUNTER'S STATEMENT AS A PRIOR INCONSISTENT STATEMENT.  THERE WAS NO TESTIMONY FOR WHICH WILLIE HUNTER'S CREDIBILITY WAS RELEVANT AND THE 31 MINUTE VIDEOTAPED STATEMENT INCLUDED HIGHLY PREJUDICIAL AND INADMISSIBLE INFORMATION.

    II.    BECAUSE MR. HAYNES' DEFENSE THEORY WAS THAT ANOTHER PERSON WAS THE PERPETRATOR, THE TRIAL COURT DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE WHEN IT DID NOT PERMIT HIM TO PRESENT EVIDENCE SUPPORTING THAT THEORY.

    III.    PROSECUTORIAL MISCONDUCT DENIED MR. HAYNES A FAIR TRIAL BECAUSE DURING ITS CLOSING ARGUMENT THE PROSECUTION (A) DENIGRATED THE DEFENSE; (B) ASSERTED A PERSONAL BELIEF ABOUT THE EVIDENCE; AND (C) USED MR. HAYNES' DECISION TO REMAIN SILENT AGAINST HIM.

    IV.    THE TRIAL COURT DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL WHEN IT ERRONEOUSLY ADMITTED HEARSAY TESTIMONY AS A "DYING DECLARATION."

Petitioner subsequently filed a *pro per* supplemental brief, raising two additional claims:

    I.    DEFENDANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO AN IMPARTIAL JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY.

    II.    DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE PROSECUTION IMPROPERLY ELICITED OPINION TESTIMONY FROM DEFENDANT REGARDING THE CREDIBILITY OF ANOTHER WITNESS.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Haynes*, No. 281998, 2009 WL 2136913 (Mich. Ct. App. July 16, 2009) (per curiam).

3

4.      Petitioner sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Haynes*, 485 Mich. 1010, 775 N.W.2d 784 (2009).

5.      On December 6, 2010, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.      DUE PROCESS REQUIRES A NEW TRIAL BASED ON A RECENTLY-OBTAINED AFFIDAVIT FROM A TESTIFYING WITNESS DEMONSTRATING THAT THE WITNESS GAVE PERJURED TESTIMONY AT DEFENDANT-APPELLANT'S TRIAL.

II.     PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT AND SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES WHERE NEW EVIDENCE REVEALS THAT THE PROSECUTION TEAM THREATENED AND INTIMIDATED A WITNESS TO PROVIDE FALSE INFORMATION OR BE HELD IN JAIL INDEFINITELY.

On February 8, 2011, the trial court denied petitioner's motion for relief from judgment, concluding that petitioner's claims were without merit.  *See People v. Haynes*, No. 06-027536-FC-5 (Saginaw County, Mich., Cir. Ct. Feb. 8, 2011) [hereinafter "Trial Ct. op. I"].  The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders.  *See People v. Haynes*, 490 Mich. 911, 805 N.W.2d 189 (2011); *People v. Haynes*, No. 302957 (Mich. Ct. App. Apr. 19, 2011).

6.      On December 12, 2011, petitioner filed a second motion for relief from judgment in the trial court, raising the following claims:

I.      DEFENDANT IS ENTITLED TO A NEW TRIAL BASED ON THE AFFIDAVIT OF AN EYEWITNESS TO THE SHOOTING, STATING THAT THE DEFENDANT WAS NOT THE SHOOTER.

II.     DUE PROCESS REQUIRES VACATING MR. HAYNES' CONVICTION AND SENTENCE WHERE THERE WAS LEGALLY INSUFFICIENT

EVIDENCE OF SECOND-DEGREE MURDER.

III.     MR. HAYNES WAS DENIED HIS SIXTH AMENDMENT RIGHT TO
         THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL AND HIS
         FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FULL AND
         FAIR APPEAL OF RIGHT WHERE COUNSEL FAILED TO RAISE
         "SIGNIFICANT" AND "OBVIOUS" ISSUES ON HIS APPEAL OF
         RIGHT.

On February 1, 2012, the trial court denied petitioner's motion, concluding that the first claim was

without merit and that the second and third claims were barred as a prohibited successive motion

pursuant to MICH. CT. R. 6.502(G).  *See People v. Haynes*, No. 06-027536-FC-5 (Saginaw County,

Mich., Cir. Ct. Feb. 1, 2012) [hereinafter "Trial Ct. op. II"].  The Michigan Court of Appeals and

Michigan Supreme Court subsequently denied petitioner's applications for leave to appeal in

standard orders, based on petitioner's "fail[ure] to meet the burden of establishing entitlement to

relief under MCR 6.508(D)."  *People v. Haynes*, 493 Mich. 897, 822 N.W.2d 775 (2012); *People

v. Haynes*, No. 308858 (Mich. Ct. App. Aug. 24, 2012).

        7.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on January 29, 2013.  As grounds for the writ of habeas corpus, he raises the eleven claims raised

in state courts.

        8.      Respondent filed his answer on August 5, 2013.  He contends that petitioner's first,

third, seventh, and eighth claims are barred by petitioner's procedural default in the state courts, and

that each of petitioner's claims is without merit.

        9.      Petitioner filed a reply to respondent's answer on September 17, 2013.

B.      *Factual Background Underlying Petitioner's Conviction*

        Petitioner's convictions arise from the March 6, 2006, shooting death of Billy Burton.  The

evidence adduced at trial was accurately summarized in the brief filed by petitioner's counsel on

direct appeal:

On March 6, 2006, Prettie Youngblood and the decedent, Billy Burton, had been living together at Birch Park Townhouses in the city of Saginaw for two years and had three children. In the time period before he was killed, Mr. Burton had become a more devoted family man and started staying home more. Ms. Youngblood did not know what he had been doing before he changed. She did not know of any trouble that Mr. Burton was having with anyone in February or March of 2006. She never saw him with a gun because he "never brought that type of stuff around me and the boys . . ."

Mr. Burton and Mr. Haynes grew up together. Ms. Youngblood had known Mr. Haynes for as long as she had known Mr. Burton. Ms. Youngblood had never seen Mr. Haynes at her home.

Adam Mirelez was the maintenance supervisor at Birch Park Townhouses. He knew Mr. Burton's face but had not known his name. Mr. Mirelez knew that he lived in Prettie Youngblood's apartment at Birch Park. On the morning of March 6, 2006, he was working in the maintenance garage when he heard two or three gunshots. He waited for one to three minutes and then peeked out the door. He saw a young man walking backwards and then getting into a light colored car, possibly light purple or tan and possibly a Cadillac. The man was a light skinned black man, 20 to 25 years old, bushy hair, about the same height as Mr. Mirelez, 5' 11", about 150 lbs to 175 lbs, with a hoodie pulled up. Mirelez did not see a gun in that person's hands. On that day, he told the police that the car was purple, depending on how the light was hitting it.

Two other cars were in the area, a large, commercial delivery truck and the small white car, which belonged to Prettie Youngblood. The white car and the light car were front end to front end, about five to ten feet apart. The small white car was pointing in the wrong direction. The tan car backed up in Mirelez' direction and he was able to read the license plate number, ZIP 126, and write it on the garage wall.

When Mr. Mirelez left the garage, he saw that the white car was blocking traffic from leaving the complex. He moved it into a parking spot. The passenger door of the car was open and the driver's side window was partway down. Mirelez went to Burton's apartment to give him the keys. Mr. Burton was sitting on the stair, bleeding. Mirelez set the keys down and made sure that someone had called 911. Mirelez testified that Mr. Burton previously had trouble with people at Birch Park.

Mr. Mirelez told the officers on the day of the shooting that he had never before seen the person that he saw getting into the car that drove away. Mr. Mirelez knew Mr. Haynes from previous interactions. At trial, Mr. Mirelez agreed that Mr. Haynes was considerably shorter than he was. At trial, Mr. Mirelez stated that he did not know whether the person was Mr. Haynes because he did not see the person's face directly. The man did not look familiar to Mirelez.

April Revels lived at Birch Park and knew Mr. Burton and Ms. Youngblood. From her bedroom, she could see the area in front of the maintenance garage. On the morning of March 6, 2006, she was getting ready to go out when she heard tires

6

squeal in the parking lot.  She looked out the window and saw Mr. Burton in Ms. Youngblood's small white car come into the Birch Park.  A few seconds later, a newer model two-toned silver Cadillac entered from the exit side and appeared to be chasing Mr. Burton's car.  Burton's car stopped one or two car lengths from the Cadillac.

Ms. Revels saw the man in the Cadillac get out with a gun and say to Burton, "Where is my shit?"  She had seen the man previously in the neighborhood.  The man said several other things that Revels could not recall and she could not hear how Burton responded.  She then heard three gunshots.  The man was standing close enough to Burton's car to touch it when the shots were fired.  Burton got out of the car on the passenger side.  He walked briskly toward his apartment, holding himself.

Ms. Revels saw the shooter drive quickly out of the complex.  She did not see anyone else in the area and did not see anyone running from the area.  When Revels called 911, she stated that she had seen a black truck behind the white car come into the complex, turn around, and leave before the shooting.  She also told the detective this.

After the police arrived Ms. Revels went outside to the edge of the gathering crowd but did not speak to the police that day.  She did not speak with a detective until May or June of 2006.  At that time, she told detectives that the shooter "appeared to look like a guy named Maurice" but she was not sure.  She was focused on the back of the car because she was worried that the children were there.  Revels did not identify Mr. Haynes at trial as the shooter.

On the morning of March 6, 2006, Gregory Works was at Mr. Burton's townhouse.  He had known Mr. Burton for several years and visited Mr. Burton almost every day, when Ms. Youngblood was not home.  Mr. Works knew Mr. Haynes from the neighborhood.  Their relationship was "all right."  The relationship between Mr. Haynes and Mr. Burton was also "all right."

At some point that morning, Mr. Burton left in the car to go to the store.  He returned a short time later and knocked on the door.  Mr. Works had not heard any gunshots.  Burton was holding his chest when Mr. Works let him into the house.  Mr. Burton said something like "niggas . . . got me."  Works asked who had gotten him and Burton responded, "Maurice."  After a few minutes Mr. Burton sat down on the steps, where he remained until the ambulance arrived.  Mr. Burton was taken away by ambulance and died in the hospital.

Mr. Works spoke to more than one police officer at the time of the shooting.  When the officers asked him who had done it, Works told them that he did not know.  He testified that he did not remember telling officers that he did not know who had shot Mr. Burton.  Mr. Works had prior convictions for larceny from a building and home invasion.

On March 6, 2006, Marcus George heard a gunshot as he was leaving his Birch Park apartment.  He saw a newer model tan or gold Chrysler 300 speed off on the wrong side of the entranceway.  Mr. George was sure that the car speeding off was a Chrysler, not a Cadillac.  The drive was a dark skinned, stocky African-American man with a "pretty big" afro, who appeared to be about 5' 11" or 6'.  Mr.

George had known Mr. Haynes for years and asserted that Mr. Haynes was not the driver.

On March 6, 2006, at about 10:55 a.m. Saginaw Police Officer John Williams arrived at Mr. Burton's Birch Park apartment. Mr. Burton was seated on the stairs in th entryway with blood on his shirt and did not appear to be conscious. Mr. Works was upset and demanded help for Mr. Burton. Officer Williams asked Works who the shooter was but he never responded.

Saginaw Police Officer Amanda Silvernaile also interviewed Mr. Works that morning but he did not tell her who the shooter was. She testified that Works was upset and did not want to speak with the police. Officer Silvernaile observed footprints in the snow near the crime scene. Saginaw City Police Officer Terry Carpenter observed that there was a lot of foot and vehicular traffic in the area. Saginaw Police Detective James Vondette testified that he responded to the crime scene on March 6, 2006, at about 11:00 a.m. He looked for footprints and tire impressions in the snow in the parking area. He found none.

On March 6, 2006, Saginaw City Police Detectives Tim Fink and Andrew Carlson got the licence plate number from Mr. Mirelez. Fink investigated the crime scene for other evidence, such as footwear impressions, but found nothing. He was not given the name of any other potential suspects and he was not aware of any other potential suspects. Fink did have other information but deemed it "not credible."

Detective Fink traced the plate to a 2006 Cadillac in the Saginaw area and owned by Avis. Detective Carlson obtained a copy of the Avis rental agreement for the Cadillac and started seeking Haynes as a suspect. Mr. Haynes called Detective Carlson on March 8, 2006. On March 10, 2006, Mr. Haynes turned himself in at the Saginaw police department with counsel and was taken into custody.

Avis Rent-A-Car manager Paulette Jar testified that on February 23, 2006, Gloria Haynes rented a cream Cadillac DTS, with a license plate number of ZLP 126. On that date, Ms. Haynes had exchanged one Avis Cadillac for another. The rental agreement on the second Cadillac was scheduled to end on March 10, 2006.

Gloria Haynes, Mr. Haynes' mother, testified that in February of 2006, she exchanged her rented Cadillac because there was something wrong with it. On the day of the shooting, Ms. Haynes had slept until about 11:00 a.m. She did not know where the car was earlier that day. Mr. Haynes had access to her Cadillac. She started to return the second Cadillac because the indicator light for the tire pressure had come on. On March 6, 2006, Saginaw Detective Sergeant Mark Lively stopped Ms. Haynes while she was on her way to Avis to return the Cadillac.

On March 7, 2006, Detective Vonette examined Youngblood's white Plymouth Breeze. There was a bullet hole in the passenger side front door. Based on the angle, the bullet struck the door when the door was open. He sent three fingerprints and a partial lower palm print from the driver's side door to the Michigan State Police Crime Lab. He did not find any soot or stippling on the car. He also started the Cadillac and let it run for about 15 minutes. No indicator lights came on during that time. Officer Vondette did not perform a gunshot residue test on the steering wheel of the Cadillac.

Detective Lieutenant Kathleen Boyer of the Michigan State Police Crime Lab testified as a fingerprint and analysis expert. No one from the State Police Crime Lab went to the crime scene in this case. She received two usable fingerprints and a partial palm print. No identification was made from the fingerprints. She was given Maurice Haynes' name as the known suspect and, over defense counsel's objection, opined that the latent partial palm print matched Mr. Haynes'. The identification was verified by another examiner. Boyer could not determine the age of the print.

In September of 2006, Detective Carlson met with Saginaw County Jail inmate Willie Hunter at the Saginaw City Police Department for a videotaped interview. Carlson did not promise Mr. Hunter anything but said that he would look into a transfer from Saginaw County Jail to Bay County Jail. No prosecutor ever told Carlson that the prosecutor's office would make a deal with Mr. Hunter.

At trial, Willie Hunter testified that he met Mr. Haynes in the Saginaw County Jail. Mr. Haynes told Hunter "what he was in there for–for murder . . ." Because Mr. Hunter would not testify that Mr. Haynes had confessed to the shooting, the prosecution asked that a previously recorded statement by Mr. Hunter be played for the jury as a prior inconsistent statement. Over defense counsel's objection, the entire 31 minute video was played for the jury.

On the video, Mr. Hunter claimed that Mr. Haynes discussed in great detail with him the details of fabricating an alibi, including paying an "old man" to lie in court. Hunter claimed that Mr. Haynes eventually discarded the alibi plan because of the palm print. Mr. Hunter told Carlson that Mr. Haynes related to him that Mr. Works and Mr. Burton had robbed a "dope spot" associated with Mr. Haynes. Hunter said that Mr. Haynes was angry about the robbery and wanted to "take care of it" because he was responsible for the people at the drug house. Allegedly, there were previous incidents between Mr. Burton and Mr. Haynes, including a threat by Mr. Burton to "beat down" Mr. Haynes. According to Mr. Hunter, on the morning of the murder, Mr. Haynes left from the dope house during the Ellen Degeneres Show in the rented Cadillac.

On the video, Mr. Hunter claimed that Mr. Haynes said he blocked in Mr. Burton's car at the apartment complex and caught Mr. Burton by surprise. Mr. Haynes allegedly told Hunter that the palm print was on the car because he leaned on it when he shot Mr. Burton. He also told Detective Carlson that Mr. Haynes told him that the reason there was no blood or gun powder was because he shot over the car. Mr. Hunter gestured like he was firing a weapon at a downward angle. Carlson asked him how many shots were fired and Hunter again gestured to demonstrate how Mr. Haynes had allegedly gestured to show more than one shot.

On the video, Mr. Hunter told Detective Carlson that the reason that Mr. Mirelez would not identify Mr. Haynes as the shooter was because he was afraid and would have to move if he chose to do that. Mr. Hunter asserted that Mr. Mirelez was not going to cooperate with the police. He also stated that Mr. Haynes bragged in jail about giving Mr. Burton "the business." When Mr. Haynes was accused by another inmate of killing Mr. Burton by mistake, he denied that he had shot him by

mistake.

At trial, Mr. Hunter revealed that he learned about the facts of the case only from reading transcripts and police reports and from talking to other people at the jail.

Forensic Pathologist Dr. Kanu Virani testified that Mr. Burton died as the result of a gunshot wound from a large caliber firearm. The gunshot wound was consistent with Mr. Burton having been in the car's driver seat when he was shot, if the shooter was outside the car. Dr. Virani did not find any stippling or gun powder residue around the entrance wound. Stippling indicates a close shot, usually within two feet.

Outside the presence of the jury, Dr. Virani for the first time examined the bullet hole in the sweatshirt that Mr. Burton had been wearing when he was shot. Dr. Virani did not see any gun powder residue, but averred that there may be chemical residue detectable only in the laboratory. The court ruled that Dr. Virani could not testify about this information because of the lack of relevancy and danger of misleading the jury.

Maurice Haynes testified that on the morning of March 6, 2006, he went to Birch Park to visit his daughter who lived there with her mother Lotoya Cook. He arrived at Birch Park at about 10:30 or 11:00 a.m. in his mother's rented tan Cadillac. When he drove into the complex, he saw that Ms. Cook's car was not in the lot, so he immediately started to leave the complex. As he was leaving, he saw Mr. Burton drive into the complex. He had known Mr. Burton his whole life and was friends with Ms. Youngblood. He did not know that Mr. Burton lived in Birch Park, but saw him daily. They both stopped. Mr. Haynes got out of his car and walked over to the driver's side of Mr. Burton's car. They chatted for a few minutes. Mr. Haynes did not remember touching the car's window but it was possible. He did not see a gold Chrysler 300 while he was speaking with Mr. Burton.

While they were talking, Mr. Haynes noticed someone coming up on foot from the side or behind him. He did not notice the person until the person was right next to him. Mr. Burton and this man got into an argument of some sort. Mr. Haynes saw a handgun in the person's hand. The person with the gun was a light-skinned African-American man with an afro and wearing a dark hoodie. The man was taller than Mr. Haynes, who was 5' 2". Mr. Haynes did not recognize the man.

Mr. Haynes turned around, walked away, and got into his car and left. The gun made him very nervous. He heard two shots as he was walking quickly to his car. He did not turn around to look. As he was driving off, he noticed that Mr. Burton's passenger side door was open but did not see Mr. Burton. He did not see where the shooter went. He did not know that Mr. Burton had been shot and did not make any phone calls after hearing the shots.

After leaving the apartment complex, Mr. Haynes drove back to his mother's house. He did not tell her to get rid of the car and did not notice anything wrong with the car. Mr. Haynes testified that when he called Detective Carlson on March 8, 2006, he did not know why the detective wanted to speak with him. He told the detective that his lawyer told him to call and to set up an appointment for the next

10

week.  He never asked Detective Carlson why the detective wanted to speak with
him.  He assumed it was about what had happened at Birch Park.  His family could
not contact him between March 6 and March 10, 2008, because his cell phone
company had shut off his phone on March 6.  He turned himself in with a lawyer
later that week.

Mr. Haynes did not know April Revels.  He knew Gregory Works.  He
asserted that Maurice is a common name in his neighborhood.  Mr. Haynes testified
that Mr. Hunter made up what had been said on the videotape.

Def.-Appellant's Br. on Appeal, in *People v. Haynes*, No. 281998 (Mich. Ct. App.), at 1-11

(footnotes and citations to trial transcript omitted).

C.    *Procedural Default*

Respondent first contends that several of petitioner's claims are barred by petitioner's

procedural default in the state courts.  Specifically, respondent contends that: (1) petitioner's first

claim, alleging improper admission of Hunter's video interview, is barred by petitioner's failure to

object at trial; (2) portions of petitioner's prosecutorial misconduct claims (those relating to the use

of his post-arrest silence and questioning petitioner about the credibility of another witness) are

barred by petitioner's failure to object at trial; (3) petitioner's seventh claim, asserting insufficiency

of the evidence, is barred by petitioner's failure to raise the claim on direct appeal or in his first

motion for relief from judgment; and (4) petitioner's eighth claim, asserting ineffective assistance

of appellate counsel, is likewise barred by petitioner's failure to raise the claim in his first motion

for relief from judgment.  The Court should agree that these claims are procedurally defaulted.

1.    *Legal Standard*

Under the procedural default doctrine, a federal habeas court will not review a question of

federal law if the state court's decision rests on a substantive or procedural state law ground that is

independent of the federal question and is adequate to support the judgment.  *See Coleman v.*

*Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration

11

of a federal claim on either direct or habeas review unless the last state court rendering a judgment

in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489

U.S. at 263.  Furthermore, "only a 'firmly established and regularly followed state practice' may be

interposed by a State to prevent subsequent review . . . of a federal constitutional claim."  *Ford v.*

*Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984));

*see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir.

1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must

be clear, consistently applied, and well-established at the time of the petitioner's purported

default.").  If a claim is procedurally defaulted, a habeas court may not review the claim unless the

petitioner establishes cause for, and prejudice attributable, to the default, or that failure to consider

the claim will result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.

2.     *Default*

Here, the Michigan Court of Appeals concluded that petitioner had failed to preserve his

claim challenging the admission of Hunter's videotaped interview because petitioner failed to object

at trial.  *See Haynes*, 2009 WL 2136913, at *1.[2]  The court of appeals likewise found that petitioner's

prosecutorial misconduct claims challenging the prosecutor's use of his post-arrest silence and

questioning of him regarding the credibility of another witness were not preserved in the trial court.

*See id*. at *3, *4.  This state procedural rule, commonly known as the contemporaneous objection

---

[2]Petitioner contends that the Michigan Court of Appeals erred in finding that counsel had failed to object.  This argument is without merit.  At trial, counsel did object to playing the tape of the interview in its entirety, rather than just showing selected portions which were inconsistent with Hunter's trial testimony.  *See* Trial Tr., Vol. II, at 130.  Petitioner did not raise this claim on appeal (or in his habeas application).  Rather, he argued on appeal that Hunter's prior statement was inadmissible *in toto* because it was not impeaching.  This is the same claim petitioner raises here.  Counsel did not raise this objection in the trial court, and thus the court of appeals was correct in concluding that petitioner's appellate claim was not preserved in the trial court.

rule, was firmly established and regularly followed at the time of petitioner's trial.  *See, e.g.*, *People v. Duncan*, 402 Mich. 1, 15-16, 260 N.W.2d 58, 61-62 (1977); *People v. Curry*, 175 Mich. App. 33, 39, 437 N.W.2d 310, 314 (1989).  As the state court clearly and expressly relied on this state procedural rule with respect to petitioner's third claim, this claim is barred absent a showing of either cause and prejudice or a fundamental miscarriage of justice.  *See Engle v. Isaac*, 456 U.S. 107, 125-129 (1982) (state contemporaneous objection rule is adequate procedural bar precluding consideration of habeas claims).  Further, this conclusion is not altered by the fact that the Michigan Court of Appeals did consider the merits of petitioner's claim.  It is clear that the court of appeals did so only in the context of determining whether petitioner could establish plain error to overcome his procedural default.  "[P]lain error review by the state court does not constitute a waiver of procedural default rules."  *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *see also*, *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

Petitioner's seventh and eighth claims, asserting respectively insufficiency of the evidence and ineffective assistance of appellate counsel, were raised for the first time in petitioner's second motion for relief from judgment.  The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal the trial court's denial of his second motion for relief from judgment in standard orders, based on petitioner's "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Haynes*, 493 Mich. 897, 822 N.W.2d 775 (2012); *People v. Haynes*, No. 308858 (Mich. Ct. App. Aug. 24, 2012).  The Sixth Circuit has held that the form orders used by the Michigan courts constitute unexplained orders which are ambiguous as to whether a procedural bar is being invoked, and thus a federal habeas court must "look through" these orders to the last reasoned state court judgment to determine if the

13

claims are barred. *See Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc). Looking through to the trial court's order, the trial court clearly and expressly relied on a procedural bar in rejecting these claims. Specifically, the trial court concluded that petitioner's claims were barred by MICH. CT. R. 6.502(G), which prohibits successive motions for relief from judgment that are not based on newly discovered evidence or a retroactive change in the law. *See* Trial Ct. op. II, at 2. The trial court's order constitutes a clear and express reliance on an adequate and independent state procedural rule. *See Stewart v. McQuiggin*, No. 2:10-CV-13365, 2013 WL 593465, at *8 (E.D. Mich. Feb. 15, 2013) (Edmunds, J.). Accordingly, these claims are likewise defaulted.

   3.   *Exceptions*

### a. Cause and Prejudice

Because each of the claims discussed above is procedurally defaulted, review of these claims is barred unless petitioner is able to meet one of the two exceptions to the procedural default rule. The first exception requires petitioner to demonstrate cause for, and prejudice attributable to, his default. *See Coleman*, 501 U.S. at 750; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). The Court should conclude that he cannot show cause for his procedural default.

To establish "cause," petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also*, *Coleman*, 501 U.S. at 753. With respect to his prosecutorial misconduct and evidentiary claims, petitioner asserts no grounds as cause to excuse his procedural default. His failure to "advance any argument in support of a finding of cause" with respect to these claims renders his "cause . . . argument abandoned." *Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003). With respect to his seventh and eighth claims, petitioner contends that appellate counsel was ineffective

14

for failing to raise these claims on his direct appeal. As the Supreme Court has observed, "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to establish cause. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). In order to constitute cause, however, counsel's performance must amount to ineffective assistance of counsel under the Sixth Amendment. *See id.* Here, petitioner's default with respect to these claims was not only in his failure to raise them on direct appeal, but also to raise them in his first motion for relief from judgment. Petitioner had no constitutional right to counsel in connection with his first motion for relief from judgment, and thus petitioner cannot establish cause with respect to these claims. *See Coleman*, 501 U.S. at 752.

Because petitioner must establish both cause and prejudice, his failure to establish cause makes it unnecessary to consider the prejudice issue. *See Hargrave-Thomas v. Yukins*, 374 F.3d 383, 389 (6th Cir. 2004); *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004). Nevertheless, as noted below even if petitioner could establish cause, he cannot establish prejudice because his claims are without merit. *See Nunn v. Yukins*, No. 98-2309, 2000 WL 145378, at *1 (6th Cir. Feb. 4, 2000) (no prejudice where defaulted claims were meritless); *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994) (same); *Alvarez v. Straub*, 64 F. Supp. 2d 686, 696 (E.D. Mich. 1999) (Rosen, J., adopting Report & Recommendation of Komives, M.J.) (same).

### b. Actual Innocence

Under the second exception, known as the "fundamental miscarriage of justice" exception, petitioner can still have his procedurally barred claims reviewed if he can show that the constitutional errors he alleges "'ha[ve] probably resulted in the conviction of one who is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Murray*, 477 U.S. at 496);

accord *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986).  In order to be entitled to the actual

innocence exception, however, a petitioner must present "new and reliable evidence that was not

presented at trial" that "show[s] that it is more likely than not that no reasonable juror would have

found him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 299 (1995).  "To

establish the requisite probability, the petitioner must show that it is more likely than not that no

reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327

(internal citation and quotation omitted); *see also*, *Bousley*, 523 U.S. at 623.  It is not sufficient to

show merely that the evidence raises a reasonable doubt which did not otherwise exist.  *See Schlup*,

513 U.S. at 329 ("The meaning of actual innocence . . . does not merely require a showing that a

reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have

found the defendant guilty.").  "Examples of evidence which may establish factual innocence

include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory

scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord*

*Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness

accounts, or critical physical evidence").  *See generally*, *Souter*, 395 F.3d at 589-90.  "'[A]ctual

innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523

U.S. 614, 623 (1998).  Thus, to establish the actual innocence exception "petitioner must show that,

as a factual matter, he did not commit the crime for which he was convicted." *Finley v. Johnson*,

243 F.3d 215, 220 (5th Cir. 2001).  In short, "the *Schlup* standard is demanding," *McQuiggin v.*

*Perkins*, 133 S. Ct. 1924, 1936 (2013), with the result that "tenable actual-innocence gateway pleas

are rare." *Id*. at 1928.

Here, petitioner has pointed to no new, reliable evidence of the type identified in *Schlup* that

16

shows he is actually innocent.  In support of his substantive actual innocence claim, petitioner

provides the affidavits of Works and a new witness, J.T. Truss.  Works avers that he did not testify

truthfully at trial–specifically, that he lied when he testified that the victim identified the perpetrator

as Maurice–and that he was coerced into testifying falsely by the threat of prosecution if he did not

testify.  Works's affidavit is dated January 19, 2010, but it is neither sworn to under penalty nor

notarized.  Truss avers that he witnessed the shooting, and his version supports the version of events

testified to by petitioner at trial–namely, that another person shot the victim, while petitioner was

walking away.  Truss avers that he did not come forward before because he was on parole at the time

and feared he would be violated.  Truss's affidavit is notarized, and was executed on June 3, 2011.

These affidavits fall short of meeting the demanding standard set forth in *Schlup*.

It is well established that "recanting affidavits are always viewed with 'extreme suspicion,'"

*Matthews v. Ishee*, 486 F.3d 883, 895 (6th Cir. 2007) (quoting *United States v. Chambers*, 944 F.2d

1253, 1264 (6th Cir. 1991)), and thus "[c]ourts are particularly reluctant to grant [new trial] motions

where the newly discovered evidence consists of a witness recantation[.]" *United States v. DiPaolo*,

835 F.2d 46, 49 (2d Cir. 1987).  Affidavits such as the ones submitted by petitioner are "treated with

a fair degree of skepticism," *Herrera v. Collins,* 506 U.S. 390, 423 (1993), and are viewed with

"extreme suspicion." *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991); *see also Byrd*

*v. Collins,* 209 F.3d 486, 508 n. 16 (6th Cir. 2000).    Likewise, new statements from witnesses years

after the crime are inherently suspect, *see Schlup*, 513 U.S. at 331, and such statements are to be

viewed with "a degree of skepticism." *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring); *see*

*also*, *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (citing *United States v. Willis*, 257

F.3d 636, 645 (6th Cir. 2001); *Byrd v. Collins,* 209 F.3d 486, 508 n. 16 (6th Cir. 2000).  Works

executed his affidavit over two years after petitioner was convicted, and Truss executed his affidavit nearly three years after petitioner was convicted. *See Lewis v. Smith,* 110 Fed. Appx. 351, 355 (6th Cir. 2004) (proper for district court to reject as suspicious a witness' recanting affidavit made two years after petitioner's trial); *Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993) (recantation more than four years after trial testimony was dubious). Further, Works's "affidavit" is entitled to little, if any, weight because it was not notarized or sworn to under penalty of perjury. *See Teahan v. Almager*, 383 Fed. Appx. 615, 615 (9th Cir. 2010) (unsworn statements of purported alibi witnesses given to counsel were insufficient to show actual innocence); *Milton v. Secretary, Dep't of Corrections*, 347 Fed. Appx. 528, 531 (11th Cir. 2009) ("The alleged 'Oath Statement' of the victim's mother is not new, reliable evidence because it is not sworn to or signed by the purported author."). For these reasons, the Court should conclude that petitioner has failed to demonstrate he is actually innocent under the demanding *Schlup* standard.

D.   *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination

18

of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.  As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).  As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)).  Thus,

"[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412). The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements

20

of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).[3]

E.    *Evidence Claims (Claims I, II, and IV)*

    Petitioner raises three claims challenging the admission or exclusion of evidence at trial. In his first claim, he argues that he was denied a fair trial by the admission of Hunter's videotaped interview as a prior inconsistent statement. In his second claim, petitioner argues that he was denied his right to present a defense by the exclusion of evidence relevant to his defense that another person shot the victim. In his fourth claim, petitioner contends that he was denied his right to confront the witnesses by the admission of the victim's statement to Works that "Maurice" shot him. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

    1.    *Prejudicial Evidence (Claim I)*

    Petitioner first claims that he was denied a fair trial by the introduction of Hunter's videotaped police interview, which was introduced to impeach Hunter's trial testimony. In the

---

    [3]Although as noted above petitioner procedurally defaulted his evidentiary claim and some of his prosecutorial misconduct claims, the AEDPA standard of review nonetheless applies to each of petitioner's claims to the extent this Court addresses those claims on the merits. With respect to each of these claims, the Michigan Court of Appeals considered the merits in determining whether petitioner could establish plain error. The Sixth Circuit has "squarely endorsed the view that 'a federal constitutional claim reviewed by a state court for "plain error" can be considered "adjudicated on the merits" for the purpose of receiving deference under AEDPA.'" *Bond v. McQuiggan*, 506 Fed. Appx. 493, 498 n.2 (6th Cir. Nov. 29, 2012) (quoting *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009)). Petitioner's seventh and eighth claims, however, were not addressed on the merits in any fashion, and thus to the extent the Court considers the claims on the merits they are reviewed *de novo*, not under the deferential standard set forth in § 2254(d).

videotaped interview, Hunter claimed that petitioner confessed to the murder while the two were detained together in the Saginaw County Jail. Hunter described the details of the crime as related to him by petitioner. At trial, however, Hunter recanted his statement to the police and denied that petitioner had confessed. The prosecutor therefore sought to introduce Hunter's videotaped interview as a prior inconsistent statement to impeach his trial testimony. The trial court permitted the introduction of the videotaped interview, over petitioner's objection. Petitioner contends that he was thereby deprived of a fair trial.

Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see*

22

*also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings."  *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

Here, petitioner cannot show that the introduction of Hunter's videotaped statement deprived him of a fair trial.  Petitioner argues that the prosecution used Hunter's trial recantation as a subterfuge to introduce his prior inconsistent statement as substantive evidence of petitioner's guilt.  Nothing in the record supports this view.  Hunter testified at trial that petitioner did not confess.  At that point, the prosecution was permitted to introduce extrinsic evidence of Hunter's prior inconsistent statement to impeach his trial testimony.  *See* MICH. R. EVID. 613.  More importantly, even if the prosecution called Hunter solely for the purpose of introducing his prior inconsistent statement as substantive evidence, this would raise no cognizable constitutional claim.  the rule prohibiting the use of a prior inconsistent statement as substantive evidence of guilt is not a rule of constitutional dimension.  *See Isaac v. United States*, 431 F.2d 11, 15 (9th Cir. 1970).  Thus, the use of these witnesses' prior inconsistent statements, even if contrary to state evidence law, does not raise a federal constitutional claim cognizable on habeas review.  *See Neal v. McKee*, No. 04-CV-40275, 2006 WL 846747, at *7 (E.D. Mich. Mar. 29, 2006) (Gadola, J.); *Catlett v. Stovall*, No. 05-CV-72890, 2006 WL 3103687, at *5 (E.D. Mich. Oct. 31, 2006) (Rosen, J.).  Further, the trial court instructed the jury: "If you believe that a witness previously made a statement inconsistent with his or her testimony at this trial, the only purpose for which that earlier statement can be considered by you is in deciding whether the witness testified truthfully in court.  The earlier statement is not

23

evidence that what the witness said earlier is true." Trial Tr., Vol. IV, at 174.  It is well established that a court must presume that a jury follows the instructions given by the trial court.  *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *see also*, *Shannon v. United States*, 512 U.S. 573, 585 (1994); *United States v. Olano*, 507 U.S. 725, 740 (1993); *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).  In these circumstances, the introduction of Hunter's videotaped interview as an impeaching prior inconsistent statement did not deprive petitioner of a fair trial.  *See Christopherson v. Boone*, 49 Fed. Appx. 257, 261 (10th Cir. 2002).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Right to Present a Defense (Claim II)*

Petitioner next contends that he was denied his right to present a defense by the trial court's exclusion of evidence that would have supported his defense that another person shot Burton.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

a.  *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law.  Implicit in these provisions is the right to present a meaningful defense.  As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus

24

grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408. Although the right to present a defense is fundamental, it is not absolute. Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998). In particular, the Supreme Court has "never questioned that power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability–even if the defendant would prefer to see that evidence admitted." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "Only rarely" has the Supreme Court "held that the right to present a complete defense was violated by the exclusion of evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (per curiam).

Further, to constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308. A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th

Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court).

### b.  Analysis

Petitioner contends that he was denied a fair trial by the trial court's prohibition on him exploring four areas of testimony relevant to his defense that another person committed the murder. First, petitioner sought to cross-examine Mirelez regarding whether petitioner had problems with other people in the neighborhood.  The trial court sustained the prosecution's objection to this line of questioning, finding that it called for speculation and hearsay.  *See* Trial Tr., Vol. II, at 190-92. Second, petitioner sought to introduce evidence that the victim had worked as an informant for the Saginaw police several years prior to the shooting, in 2000 or 2001.  The trial court concluded that this evidence was too remote in time to be relevant.  *See id.*, Vol. IV, at 7-8.  The Michigan Court of Appeals rejected petitioner's claim that the exclusion of these two areas of testimony deprived him of his right to present a defense, reasoning:

> The evidence sought to be admitted cast a mere or bare suspicion on others generally and was insufficient to connect, in any concrete fashion, a particular person or persons to the crime; the evidence was tenuous at best.  The evidence was too remote and speculative, and it did not clearly point to another person as the guilty party. Any inference that another person was the perpetrator would be conjectural absent additional evidence, which was not provided, establishing a connection between the crime and another person.

*Haynes*, 2009 WL 2136913, at *2.  This determination was reasonable.

"The Supreme Court has not articulated the specific set of circumstances under which a criminal defendant must be permitted to introduce evidence of third-party culpability."  *Smith v. Terhune*, 82 Fed. Appx. 185, 186 (9th Cir. 2003).  The Michigan Court of Appeals explained that, under Michigan law, evidence of third party guilt may "be excluded where it does not sufficiently

connect the other person to the crime, such as where the evidence is speculative or remote, where it does not tend to prove or disprove a material fact in issue, where it has no effect other than to cast a bare suspicion upon another person, or where it raises a conjectural inference regarding the commission of the crime by another person." *Haynes*, 2009 WL 2136913, at *2. This reflects the general rule regarding evidence of third party guilt, one that the Supreme Court has suggested is permissible. *See Holmes v. South Carolina*, 547 U.S. 319, 327-28 (2006); *Miller v. Brunsman*, 599 F.3d 517, 526 (6th Cir. 2010) (discussing *Holmes*). In light of this well established rule, and in light of the fact that petitioner's proffered evidence "does not even raise a possible ground of suspicion against any particular person or group of persons," *Lizarraga v. Pliler*, No. CIVS011062, 2005 WL 1704371, at *26 (July 14, 2005), *magistrate judge's report adopted*, 2005 WL 2436081 (E.D. Cal. Sept. 30, 2005), it cannot be said that the court of appeals's conclusion that exclusion of this evidence did not deprive petitioner of his right to present a defense was an unreasonable application of clearly established law under § 2254(d)(1). *See Dodd v. Trammell*, ___ F.3d ___, ___, 2013 WL 7753714, at *11 (10th Cir. Oct. 16, 2013); *Miller*, 599 F.3d at 525-26; *Smith*, 82 Fed. Appx. at 186-87; *DiBenedetto v. Hall*, 272 F.3d 1, 9 (1st Cir. 2001).

Petitioner also sought to introduce evidence in the form of a recording of a 911 call in which the caller indicated that the shooter fled on foot, and that the shooter had shot into a Cadillac. The trial court excluded this evidence, concluding that it was hearsay. The court did rule that counsel could explore with Detective Fink whether he had received information that someone else could have committed the crime and what he did to investigate that information. *See* Trial Tr., Vol. IV, at 4-5. The Michigan Court of Appeals rejected petitioner's argument, concluding that the 911 tape was inadmissible under the hearsay rules. *See Haynes*, 2009 WL 2136913, at *3. This

determination was reasonable. There is no doubt that the statements made by the 911 caller constitute hearsay, and there is likewise no doubt that petitioner's right to present a defense does not relieve him from his obligation to comply with the rules of evidence, *see Clark v. Arizona*, 126 S. Ct. 2709, 2731-32 (2006); *Scheffer*, 523 U.S. at 308. It is true that the Court has held that state hearsay rules may not be applied mechanistically so as to prevent a defendant from presenting evidence fundamental to his defense. *See Chambers*, 410 U.S. at 302, 313. However, *Chambers* and its progeny "do not stand for the proposition that a petitioner's due process rights are violated any time a state court excludes evidence that the petitioner believes is the centerpiece of his defense. Instead, the cases . . . stand for the more limited proposition that a defendant's due process rights are violated when a state court excludes important evidence on the basis of an arbitrary, mechanistic, or per se rule, or one that is disproportionate to the purposes it is designed to serve." *Alley v. Bell*, 307 F.3d 380, 394 (6th Cir. 2002). In other words, application of the rules of evidence constitute a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308. Petitioner cannot show such an infringement here. To the extent petitioner sought to prove the truth of the matter asserted–that the perpetrator fled on foot–the 911 caller's statement was without any context. Further, the caller's description of the events was wholly unreliable, in that it contradicted the evidence presented in the case by claiming that the perpetrator shot into petitioner's car, *i.e.*, the Cadillac. There was no evidence to support this version of events, and petitioner himself does not claim that his car was fired upon. To the extent, as argued by counsel, that the evidence was relevant not to prove the truth of the matter asserted but to show the inadequacy of the police

28

investigation, petitioner cannot show that the trial court's ruling significantly undermined his defense because the trial court explicitly ruled that counsel could question Detective Fink regarding his investigation of alternative suspects; only the 911 tape itself was ruled inadmissible. In these circumstances, the rejection of petitioner's claim was reasonable.

Finally, petitioner contends that he was denied his right to present a defense by the exclusion of evidence that the victim's clothes did not have soot or gunpowder residue. As described by the court of appeals:

> [D]efendant sought to admit testimony from the medical examiner regarding the absence of stippling or sooting on the victim's clothing. After the medical examiner testified that he never tested the victim's clothing for gunpowder evidence, the prosecution requested that he be allowed to do an impromptu testing, and over defense objections as to relevance, the trial court allowed it. Out of the presence of the jury, the medical examiner stated that he was unable to detect any stippling or sooting with the naked eye, but admitted that there may be some that could be detected by the lab. Defense counsel then withdrew his objection and moved for admission of the evidence. The trial court refused to admit the evidence, concluding that it was irrelevant and had the potential for misleading the jury.

*Haynes*, 2009 WL 2136913, at *3. The court of appeals found no error in the trial court's ruling "given the equivocal nature of the proposed testimony." *Id.* This determination was reasonable. The victim's clothes were never tested for gunpowder residue. The medical examiner's brief visual inspection had little probative value and a great potential to mislead the jury, as the medical examiner himself testified that trace elements might still be on the clothing yet not visible to the naked eye. Further, there is nothing in the record that establishes the medical examiner's qualifications as an expert in gunpowder residue or firearms. And even if there was no sooting or stippling, this fact had only marginal probative value to whether petitioner was the perpetrator. Generally, no sooting or stippling is present when the shot is fired from a distance of more than 18 to 24 inches, *see Evans v. Jones*, No. CIV-10-139, 2013 WL 5366385, at *24 (E.D. Okla. Sept. 24,

2013); *Busch ex rel. Estate v. Busch v. City of New York*, 224 F.R.D. 81, 91 (E.D.N.Y. 2004); *People v. Walker*, 911 N.E.2d 439, 446 (Ill. Ct. App. 2009) (all describing expert testimony regarding distances at which soot and stippling will be evident), and even then "'the absence of soot or stippling does not absolutely mean that the wound was not fired from close range. Intermediate targets and clothing can screen out stippling and soot even when the muzzle of the gun is pressed up against the clothing.'" *Whitted v. Joshua*, No. 01 C 5489, 2009 WL 2163459, at *4 n.2 (N.D. Ill. July 20, 2009) (quoting Denton, *et al.*, *Practical Pathology of Gunshot Wounds*, 130 ARCHIVES OF PATHOLOGY & LABORATORY MEDICINE, at 1283-89 (2005)). A shooting at a distance of two feet, in light of the testimony at trial, would not have provided any greater probability that petitioner was not the perpetrator. Even assuming that the medical examiner's physical examination of the clothing at trial had any probative value in the absence of laboratory testing, because the purported testimony of the medical examiner was not probative of whether or not petitioner was the shooter the exclusion of this evidence did not "infringe upon a weighty interest of" petitioner, *Scheffer*, 523 U.S. at 308, by excluding evidence that, evaluated in the context of the entire record, would have "'create[d] a reasonable doubt that did not otherwise exist.'" *Blackwell*, 459 F.3d at 753 (quoting *Washington*, 255 F.3d at 47). Thus, the Michigan Court of Appeals rejection of this claim was reasonable.

   3.    *Hearsay and Confrontation (Claim IV)*

   Petitioner next contends that he was denied a fair trial and his right to confront the witnesses by the introduction of Works's testimony that the victim told Works that "Maurice" shot him. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

   a.  *Clearly Established Law*

   The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused

30

shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.
The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due
Process Clause. *See Pointer v. Texas*, 480 U.S. 400, 406 (1965). At the time of petitioner's trial,
the standard governing the admissibility of hearsay statements under the Confrontation Clause was
that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Court explained that the
underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude
unreliable, out-of-court statements in criminal proceedings. Thus, the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial,
> the Confrontation Clause normally requires a showing that he is unavailable. Even
> then, his statement is admissible only if it bears adequate "indicia of reliability."
> Reliability can be inferred without more in a case where the evidence falls within a
> firmly rooted hearsay exception. In other cases, the evidence must be excluded, at
> least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66. As the Court explained in *Roberts*, reliability is inferred if the evidence was
admitted pursuant to a firmly rooted hearsay exception. The theory behind this presumption is that
these firmly rooted exceptions represent judgments, based on history and practice, that statements
made in certain circumstances are inherently trustworthy such that the "adversarial testing
[embodied in the Confrontation Clause] would add little to [their] reliability." *Idaho v. Wright*, 497
U.S. 805, 821 (1990). Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid
foundations that admission of virtually any evidence within [the exception] comports with the
substance of constitutional protection." *Roberts*, 448 U.S. at 66 (internal quotation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court abrogated *Roberts* as
applied to testimonial hearsay statements. After surveying the historical development of the
Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under
a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have

31

been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59.  The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause.  *See id*. at 60-68.  The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  *Id*. at 68-69.  In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68.  The Court did, however, provide some guidance.  Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52 (internal quotations and citations omitted).  While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Crawford*, 541 U.S. at 68.

*Crawford* establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay.  In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay,

and has no application at all to the admission at trial of non-testimonial hearsay. The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. The Supreme Court has since clarified that the Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay. In *Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether the Confrontation Clause applies only to testimonial hearsay," *id*. at 823, and in doing so abrogated *Roberts* in whole. The Court noted that the answer to this question was suggested in *Crawford*, when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who give "testimony." *Id*. at 823-24 (discussing *Crawford*, 541 U.S. at 51). The *Davis* Court explained that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." *Id*. at 824 Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered. *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

### b. Analysis

The Michigan Court of Appeals rejected petitioner's evidentiary claim, concluding that the

victim's statement identifying the shooter as "Maurice" was properly admitted as a dying declaration pursuant to MICH. R. EVID. 804(b)(2). *See Haynes*, 2009 WL 2136913, at *5. Petitioner takes issue with this conclusion, but as explained above petitioner cannot obtain relief based solely on an allegation that the state court erred in apply the state rules of evidence. Rather, petitioner must show that the admission of the victim's hearsay statement violated his right to confront the witnesses. Petitioner cannot make this showing, for two reasons.

First, petitioner cannot establish that Burton's statement to Works constituted testimonial hearsay to which the Confrontation Clause applies. The testimony at trial established that the statement was an excited utterance made immediately after the shooting by the victim. The statement was not made to the police or in any court setting, and was made immediately after the shooting to a friend. In these circumstances, the victim's statement was not a "testimonial" statements subject to the Confrontation Clause. *See Williams v. Adams*, 447 Fed. Appx. 829, 831 (9th Cir. 2011) (statement made by victim to his wife identifying shooter immediately after the shooting while the victim was in critical condition was not testimonial); *United States v. Franklin*, 415 F.3d 537, 545 (6th Cir. 2005) (statements made to a "friend and confidant" are not testimonial for purposes of the Confrontation Clause); *Evans v. Luebbers*, 371 F.3d 438, 445 (8th Cir. 2004) (murder victim's statements to friends that defendant had abused her like O.J. Simpson and that she might end up like Nicole Simpson were considered nontestimonial); *cf. Crawford*, 541 U.S. at 51 ("[A] formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").

Second, Burton's statement to Works was a dying declaration. In *Crawford*, the Supreme Court noted, but did not definitively determine, that the dying declaration exception may provide

34

an historical exception to the Confrontation Clause's bar on testimonial hearsay.  After explaining that none of the Court's prior cases involving other hearsay exceptions resulted in admission of testimonial hearsay, the Court observed:

> The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*.

*Crawford*, 541 U.S. at 56 n.6 (citations omitted).  In *Michigan v. Bryant*, 131 S. Ct. 1143 (2011), the Court again declined to resolve whether testimonial dying declarations are admissible as an exception to the Confrontation Clause.  *See Bryant*, 131 S. Ct. at 1151 n.1.  As the Supreme Court has explained on several occasions, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation omitted); *accord Wright v. Van Patten*, 552 U.S. 120, 126 (2008).  And in *Giles v. California*, 554 U.S. 353 (2008), the Court strongly suggested that the dying declaration exception permits the introduction of testimonial dying declarations.  In that case, the Court considered whether the common law exception allowing introduction of testimonial statements from a witness whose absence the defendant wrongfully procured (the so-called forfeiture by wrongdoing exception) survived *Crawford*.  In determining that the exception did survive, the Court  explained that the "Confrontation Clause is 'most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.'" *Id*. at 358 (quoting *Crawford*, 541 U.S. at 54).  It further explained that in *Crawford* it had "acknowledged that two forms of testimonial statements were admitted at common law even though they were

unconfronted," the second of which were covered by the forfeiture by wrongdoing exception at issue in *Giles* but the first of which consisted of "declarations made by a speaker who was both on the brink of death and aware that he was dying."   *Id*.   Because the Court upheld the admissibility of statements covered by the forfeiture by wrongdoing exception, and because the court placed that exception on a par with the historical exception for dying declarations, *Giles* strongly suggests that the Court would recognize the continued viability of the dying declaration exception to the Confrontation Clause.

To be sure, two federal district courts have concluded that testimonial dying declarations are inadmissible under the logic of *Crawford*.  *See United States v. Mayhew*, 380 F. Supp. 2d 961, 965-66 (S.D. Ohio 2005); *United States v. Jordan*, No. 04-CR-229-B, 2005 WL 513501, *3 (D. Colo. March 3, 2005).  The majority of the courts to have considered the question, however, have relied on the *Crawford* dictum to conclude that testimonial dying declarations remain admissible under the Confrontation Clause.  *See Duncan v. Bobby*, No. 1:07 CV 839, 2008 WL 111229, *8 (N.D. Ohio Jan.8, 2008); *Williams v. State*, 947 So. 2d 517, 520 (Fla. Ct. App. 2006) (citing cases); *Monterroso*, 101 P.3d at 972.  In light of the Supreme Court's explicit refusal to decide the question in *Crawford* and *Bryant*, the recognition of the historical basis of the dying declaration exception in *Giles*, and the majority of decisions recognizing the continued viability of the dying declaration exception under *Crawford*, the admission of Burton's statement as a dying declaration was not an unreasonable application of clearly established federal law.  *See Walker v. Harry*, 462 Fed. Appx. 543, 545 (6th Cir. 2012); *Martin v. Fanies*, 365 Fed. Appx. 736 (8th Cir. 2010); *Gilmore v. Lafler*, No. 2:07–cv–14010, 2010 WL 2560034, at *11 (E.D. Mich. June 15, 2010) (Borman, J.); *Jones v.*

*Davis*, No. 05CV 70897, 2006 WL 1452505, at *6 n.3 (E.D. Mich. May 23, 2006) (Rosen, J.).[4]

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Prosecutorial Misconduct (Claims III, VI, X, and XI)*

Petitioner next raises several claims of prosecutorial misconduct.  In Claims III and VI, petitioner argues that he was denied a fair trial by the prosecutor's comments and questions.  In Claims X and XI, petitioner contends that the prosecutor presented perjured testimony and intimidated a witness.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Improper Comments and Questions (Claims III & VI)*

a.  *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough

---

[4]Petitioner argues that Burton's statement was not properly admitted as a dying declaration. Under *Giles, supra,* courts are limited in applying the dying declaration exception to the common law understanding of that exception at the time the Confrontation Clause was adopted. *Cf. Giles,* 554 U.S. at 359-61 (confrontation exception for forfeiture by wrongdoing limited to that doctrine as it was understood at common law).  As adopted in Michigan, the dying declaration exception permits the introduction, "[i]n a prosecution for homicide or in a civil action or proceeding, [of] a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." MICH. R. EVID. 804(b)(2).  This standard essentially mirrors the common law definition.  The Michigan rule is identical to the federal rule established in FED. R. EVID. 804(b)(2), which in itself is a codification of the common law rule with only the expansion (irrelevant here) of the rule to apply in civil cases.  *See* FED. R. EVID. 804(b)(2), advisory committee notes to 1972 proposal and 1974 enactment.  *See generally,* 5 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW §§ 1431-34 (James H. Chadbourn rev. ed. 1974).  Petitioner does not contend that the Michigan rule's requirements that the statement be made under belief of impending death and that the statement be concerning the cause or circumstances of that impending death deviate from the common law requirements.  Nor can he show that those requirements were not satisfied in his case.  It is beyond dispute that Burton's statement concerned the cause of circumstances of his impending death.  Further, as the Michigan Court of Appeals reasonably concluded, based on testimony that at the time of the statement Burton was holding his chest and bleeding after having been shot, that Burton was in significant pain, and that Burton died a short while later, the evidence showed "that the victim believed he faced imminent death when he identified [petitioner] as the man who shot him." *Haynes,* 2009 WL 2136913, at *5.

that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). *Darden* constitutes "[t]he 'clearly established Federal law' relevant" to a prosecutorial misconduct claim. *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "[T]he *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case-determinations.'" *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In reviewing whether a prosecutor has deprived a defendant of a fair trial, a court may not consider the prosecutor's conduct in isolation, but must judge the conduct in the context of the entire proceedings. *See Brown v. Payton*, 544 U.S. 133, 144 (2005); *United States v. Young*, 470 U.S. 1, 11 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 636, 645 (1974). Even on direct review, where AEDPA deference does not apply, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Young*, 470 U.S. at 11.

### b. Analysis

Petitioner contends that the prosecutor improperly denigrated defense counsel when he began his rebuttal argument with the following remark: "Mr. Piazza left out one thing. He should have prefaced his closing argument with, 'Welcome to the wonderful World of Disney. Tonight we're traveling to fantasyland.'" Trial Tr., Vol. IV, at 164. The prosecutor then discussed why petitioner's defense that a third person had shot Burton was not supported by the evidence. *See id.* at 164-66. The Michigan Court of Appeals rejected this claim, reasoning that "the prosecutor's comment was

38

directed at and related to defendant's theory of defense, not to or about defense counsel. . . . [A] prosecutor is not required to make an argument in the blandest possible terms." *Haynes*, 2009 WL 2136913, at *3. This determination was reasonable. Viewed in context the prosecutor's comment, which was immediately followed by a discussion of the evidence, was based on the testimony introduced at trial and was directed at rebutting defense counsel's characterization of the evidence. It did not directly impugn either petitioner or defense counsel; rather, it attacked the defense asserted by counsel. The comment falls far short of even more egregious comments which have been held not to deprive a defendant of a fair trial. *See Kappos v. Hanks*, 54 F.3d 365, 367-68 (7th Cir. 1995) (petitioner not denied a fair trial where prosecutor referred to him as a "murderer" and "artful liar"); *See United States v. August*, 984 F.2d 705, 714-15 (6th Cir. 1992) (on direct review of federal conviction, prosecutor's comment that defense counsel was trying to trick the jury did not rise to the level of prosecutorial misconduct, noting that "[a] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for truth."); *Lindgren v. Lane*, 925 F.2d 198, 204 (7th Cir. 1991) (prosecutor's comments that defense theory was rife with inconsistencies, that defense counsel pulled "these inconsistencies like a magician pulls rabbits out of his hats," and that defense counsel was trying to "trick" the jury with "illusions" were not so egregious as to warrant habeas relief); *Irwin v. Singletary*, 882 F. Supp. 1036, 1043-44 (M.D. Fla. 1995) (habeas relief not warranted based on prosecutor's statement during closing argument that defendant was "grasping at straws").

Petitioner next claims that he was denied a fair trial because the prosecutor expressed a personal belief in his guilt. At the conclusion of his closing argument, after discussing the evidence,

the prosecutor stated: "Ladies and gentlemen, once again, I'm telling you that in my mind, we've proved this case beyond a reasonable doubt." Trial Tr., Vol. IV, at 138. Defense counsel objected, arguing that the prosecutor was "using his power of the office," and the prosecutor responded by rephrasing his argument, stating, "I submit to you, ladies and gentlemen, that we have proved this case beyond a reasonable doubt[.]" *Id.* at 138-39. The court of appeals rejected petitioner's claim, explaining that the prosecutor did not argue that he personally believed petitioner to be guilty, but rather "merely argu[ed] that it was his belief that the evidence presented at trial had established the prosecution's case beyond a reasonable doubt." *Haynes*, 2009 WL 2136913, at *4. This determination was reasonable. While a prosecutor may not express a personal belief in the defendant's guilt, the prosecutor expressed no such belief. Rather, the prosecutor expressed his belief, based on his summation of the evidence, that the prosecution had met its burden of proving petitioner's guilt beyond a reasonable doubt. In other words, "that the prosecutor's comment was the . . . statement [of conclusion] to a discussion of how the testimony had shown and proven that petitioner was guilty." *Brady v. Bauman*, No. 10-12978, 2012 WL 6621165, at *17 (Nov. 2, 2012) (Komives, M.J.) (internal quotation omitted), *magistrate judge's report adopted*, 2012 WL 6616366 (E.D. Mich. Dec. 19, 2012) (Battani, J.). "The fact that the prosecutor said 'I [believe]' does not cause the statement to be improper. . . . Just because a prosecutor has the habit of using phrases such as 'I think' or 'I believe', it does not mean that the argument, read as a whole, cannot be proper commentary on the evidence. While it may be a poor advocacy technique for counsel to ever use the word 'I' in argument, this in and of itself does not amount to improper argument." *Nelson v. Huibregtse*, No. 07-C-1022, 2009 WL 73149, at *9 (E.D. Wis. Jan. 6, 2009) (citing *United States v. Lindsay*, 157 F.3d 532, 536 (7th Cir. 1998)). Certainly, given the equivocal nature of the

comment and its immediate correction by the prosecutor, petitioner cannot show that the comment deprived him of a fair trial. *See United States v. Humphrey*, 287 F.3d 422, 433 (6th Cir. 2002) (to warrant reversal of conviction, prosecutor's alleged expression of personal belief in defendant's guilt "must be flagrant."), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377, 383 (6th Cir. 2002).

Petitioner also contends that he was denied a fair trial when the prosecutor asked him to comment on the credibility of other witnesses. During cross-examination of petitioner by the prosecutor, the following exchange occurred:

Q     You sat here and heard the tape – taped conversation with Willie Hunter; correct?

A     Yes.

Q     And you're saying that Willie Hunter made all of that up; he fabricated everything that he said on that tape?

A     Yes.

Q     Did you ever talk with Willie Hunter about any of these things?

A     Yes.

Q     And you had to have talked with Willie Hunter, correct?

A     What do you mean, I had to have talked to him?

Q     Well, he said that the reason you were over at Birch Park was because of your baby – or your baby's momma, correct?

A     I don't – I don't recall ever saying that.

Q     He said you were upset about your palm print being found on the car.

A     No, he didn't – I don't recall him saying that, either.

Q     You don't recall that, either?

41

A       No.

Q       He said that you told him you shot the dude?

A       Yeah, I recall him saying that.

Q       You never told him that?

A       No.

Q       He said that you identified "the dude" as Billy Ray Burton?

Trial Tr., Vol. IV, at 111-12.  Defense counsel then objected to this line of questioning.  The Michigan Court of Appeals rejected petitioner's claims, finding that the questions were not improper because a "prosecutor [is] permitted to ask the defendant whether he had a different version of facts to attempt to ascertain which facts are in dispute."  *Haynes*, 2009 WL 2136913, at *4 (citing *People v. Ackerman*, 257 Mich. App. 105, 117, 669 N.W.2d 818, 828 (2003)).  This determination was reasonable.

It is true that a number of courts, both state and federal, have held that it is improper for a prosecutor to ask a witness to testify about the veracity of another witness.  *See United States v. Sanchez*, 176 F.3d 1214, 1219-20 (9th Cir. 1999) (citing cases); *United States v. Sullivan*, 85 F.3d 743, 749-50 (1st Cir. 1996); *United States v. Montalvo*, 20 F. Supp. 2d 270, 277-78 (D.P.R. 1998) (citing cases).  All of these cases–again, both state and federal–however, were direct appeal cases in which the courts exercise supervisory powers over both the trial courts and prosecutors.  A federal habeas court has no such supervisory powers over state courts or state prosecutors.  *See Murphy v. Florida*, 421 U.S. 794, 797 (1975).  Petitioner has cited, and I have found, no cases either applying this rule in a habeas corpus case or holding that questions of this type amount to a denial of due process, as is required for habeas relief.  Thus, it is at a minimum questionable whether the rule upon

42

which petitioner relies applies here.  *See Zemina v. Solem*, 438 F. Supp. 455, 465 (D.S.D. 1977) (rejecting petitioner's claim based upon prosecutorial misconduct, noting that "[i]f . . . this were a matter of a direct appeal from a conviction in federal court, there might be reversible error.  The test in a habeas corpus proceeding, however, is more demanding[.]"), *aff'd*, 573 F.2d 1027 (8th Cir. 1978); *cf. Brecht v. Abrahamson*, 507 U.S. 619, 633, 634 (1993) (noting that "[t]he principle that collateral review is different from direct review resounds throughout our habeas jurisprudence," and that "[r]ecognizing the distinction between direct and collateral review, we have applied different standards on habeas than would be applied on direct review with respect to [various] matters[.]").  Importantly, "[t]he United States Supreme Court has never held that a prosecutor commits misconduct when she asks a defendant whether government witnesses are lying," *Coronado v. Almager*, No. CV 08-00940, 2009 WL 2900288, at *11 (C.D. Cal. Sept. 02, 2009) (citing *Hall v. Scribner*, 619 F. Supp. 2d 823, 840 (N.D. Cal. 2008)), and thus the Michigan Court of Appeals's decision is neither contrary to, nor an unreasonable application of, clearly established federal law.

Moreover, petitioner cannot show that the prosecutor's questions were prejudicial.  Here, petitioner's testimony directly contradicted the statement made by Hunter.  Indeed, Hunter himself contradicted the account he gave in his earlier statement.  Thus, the conflict between petitioner's account and the account reflected in Hunter's statement was apparent even apart from the prosecutor's questions.  In light of the nature of the evidence and the readily apparent conflict between petitioner's version of events and the version of events given by Hunter in his statement, the prosecutor's questions did not deprive petitioner of a fair trial.  *See United States v. Robinson*, 473 F.3d 387, 396 (1st Cir. 2007); *Coronado*, 2009 WL 2900288, at *11 & n.8; *Morgan v. Renico*, No. 04-CV-74685, 2007 WL 522703, at *6 (E.D. Mich. Feb. 14, 2007) (Tarnow, J.); *United States*

43

*v. Martin*, 454 F. Supp. 2d 278, 286 (E.D. Pa. 2006).

In short, the Michigan Court of Appeals thoroughly analyzed each of petitioner's prosecutorial misconduct claims, applying the appropriate due process test under *Darden*. For the reasons set forth above, the Michigan Court of Appeals's application of that test was reasonable. "[B]ecause the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations,' [this Court] ha[s] no warrant to set aside the [Michigan Court of Appeals's] conclusion." *Parker*, 132 S. Ct. at 2155 (citation omitted) (quoting *Yarborough*, 541 U.S. at 664). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

2.    *Comment on Silence (Claim III)*

Petitioner also contends that prosecutor impermissibly commented on his invocation of his right to remain silent. The Court should reject this claim.

a.  *Clearly Established Law*

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The Supreme Court has determined that this provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Nevertheless, the Court's subsequent cases have made clear that *Griffin* and *Doyle* are limited to situations in

which the defendant's silence was induced by the governmental assurances embodied in the *Miranda* warnings. *See Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (per curiam) (post-arrest statements made before *Miranda* warnings are given may be commented upon by prosecutor, noting that the Court has "consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."); *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (pre-arrest silence may be used for impeachment because "no governmental action induced [the defendant] to remain silent before arrest.").

*b. Analysis*

During closing argument, the prosecutor argued that petitioner's version of events was not credible in light of his failure to speak with the police:

> Now use your common sense. You're sitting at home, you get a call telling you to call a detective who says, hey, I need to talk to you. What do you say? Okay, but it's got to be next week because my attorney's out of town until then. Common sense. You're sitting at home, you find out that a detective – you speak with a detective, and he tells you, I want to talk to you. Now doesn't that trigger just a bit of curiosity on your part? We got a police officer that want to talk to you, a police officer that has called your attorney, telling you he want to talk to you, and you're not at all curious about what he wants to talk to you about? You don't even say what do you want to talk to me about, Detective Carlson?
>
> Use some common sense here, folks. Well, did you know what Detective Carlson wanted to talk to you about? Well, no, not for sure, but I assumed it was about what happened that week. You mean you assumed he wanted to talk to you about the shooting on March 6 at the Birch Park apartment complex? Yes, I assumed that's what he wanted to talk to me about.
>
> And yet, you didn't say Detective, I'll talk to you because I'm a witness, I was there, I saw the shooter, I saw the guy that shot my good friend, Billy Burton, I'll come in and tell you. I don't know who it was, but I can describe him to you. I don't know where he went, but I'll talk to you because I'm a witness. I had nothing to do with that.
>
> No. Once again, you don't say a word. No questions to the detective. The defendant's story is a complete fabrication. It's a lie. It makes no sense.

Trial Tr., Vol. IV, at 137-38. The Michigan Court of Appeals rejected petitioner's claim, explaining

45

that the prosecutor's comments were not directed at petitioner's post-custody silence, but at petitioner's "failure to contact police and inform them that he was a witness to the crime." *Haynes*, 2009 WL 2136913, at *4. This determination was neither contrary to, nor an unreasonable application of, any clearly established federal law, for several reasons.

First, the prosecution's questions did not go to petitioner's silence while he was in custody or was induced by the *Miranda* warnings, but to his failure to report the alleged attempt on his life in the first place. It is true that several courts of appeals, including the Sixth Circuit, have held that it violates the Fifth Amendment to use a defendant's pre-arrest silence as substantive evidence of guilt. *See Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2003). However, this is a question on which the courts are equally divided, *see id.* at 282, and, more importantly for purposes of § 2254(d)(1), the Supreme Court has never held that the use as substantive evidence of a defendant's pre-arrest silence not induced by the *Miranda* warnings violates the Fifth Amendment. On the contrary, the Court in *Jenkins* explicitly declined to "consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment." *Jenkins*, 447 U.S. at 236 n.2; *see also*, *Portuondo v. Agard*, 529 U.S. 61, 70 (2000) (noting the *Jenkins* Court's observation that "it was not clear whether the Fifth Amendment protects pre-arrest silence."). As noted in connection with petitioner's confrontation claim, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles*, 556 U.S. at 122. Thus,

> [t]he Supreme Court's failure to rule on this issue, coupled with the "disagreement and confusion" among the federal courts concerning the resolution of this issue, precludes this court from finding that the Michigan Court of Appeals' decision was an unreasonable application of clearly established federal law, where clearly established Supreme Court precedent on the issue of using prearrest silence as substantive evidence of guilt did not, and does not, exist.

46

*Mitchell v. Lafler*, No. 02-CV-74805, 2003 WL 21817616, at *4 (E.D. Mich. July 10, 2003) (Cohn, J.) (citing *Worden v. McLemore*, 200 F. Supp. 2d 746, 752-53 (E.D. Mich. 2002)), *aff'd*, 118 Fed. Appx. 24, 27 (6th Cir. 2004); *see also*, *Jones v. Trombley*, 307 Fed. Appx. 931, 934 (6th Cir. 2009).

Second, petitioner's case is directly controlled by *Jenkins*. In that case, the defendant claimed that he stabbed the victim in self-defense. At trial, the prosecutor questioned the defendant regarding his failure to report the matter to the police before his arrest and commented during closing argument that the petitioner's self-defense claim was belied by his failure to report the matter to the police. *See Jenkins*, 447 U.S. at 232-34. The Court found no violation of the Self-Incrimination Clause by the prosecutor's use of the defendant's pre-arrest silence to impeach testimony that he acted in self-defense claim. The Court explained that, in such a case, "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." *Id*. at 238; *see also*, *id*. at 243-44 (Stevens, J., concurring) (footnotes omitted) ("The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police. We need not hold that every citizen has a duty to report every infraction of law that he witnesses in order to justify the drawing of a reasonable inference from silence in a situation in which the ordinary citizen would normally speak out. When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment."). Here, as in *Jenkins*, the prosecutor merely used petitioner's failure to report the crime to the police to impeach his trial testimony that he was a mere witness to the murder of his friend. In these circumstances, petitioner cannot show that the Michigan Court of Appeals unreasonably applied clearly established federal

law in rejecting his claim.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

   3.   *Perjury/Witness Intimidation (Claims X & XI)*

   Petitioner also argues that Works committed perjury at trial because he had been threatened by the prosecutor.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

   *a.  Clearly Established Law*

   It is well established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *accord Napue v. Illinois*, 360 U.S. 264, 271 (1959).  This is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, *see Napue*, 360 U.S. at 270, and it matters not whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected, *see id*. at 269.  To succeed on this claim petitioner must show that: (1) the prosecutor presented evidence which was false; (2) the prosecutor knew of the falsity; and (3) the evidence was material.  *See Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).

   With respect to the first element, petitioner bears the burden of proving that the testimony amounted to perjury.  As the Fourth Circuit has explained, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured.  Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987); *accord United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("[N]ot every testimonial inconsistency that

goes uncorrected by the government establishes a constitutional violation."); *Horton v. United States*, 983 F. Supp. 650, 657 (E.D. Va. 1997); *United States v. Hearst*, 424 F. Supp. 307, 318 (N.D. Cal. 1976).  (6th Cir. 1999).  As the *Verser* court further explained, to establish a constitutional violation petitioner must show that the "inconsistent testimony amounted to perjury, 'the willful assertion under oath of a false, material fact.'" *Verser*, 916 F.2d at 1271 (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)); *see also*, *Horton*, 983 F. Supp. at 657 (quoting *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)) (in order to establish *Napue* violation defendant must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory.'").  In other words, petitioner must show that the testimony was "indisputably false." *Byrd v. Collins*, 209 F.3d 486, 817-18 (6th Cir. 2000).

With respect to the second element, as the Sixth Circuit has explained in order for a witness's perjury at trial to constitute a basis for habeas relief, the petitioner must show "prosecutorial involvement in the perjury." *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975).  The Sixth Circuit has repeatedly reaffirmed the requirement that a petitioner show prosecutorial involvement in or knowledge of the perjury. *See, e.g.*, *Rosencrantz v. Lafler*, 568 F.3d 583-84 (6th Cir. 2009); *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000); *King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998); *Ford v. United States*, No. 94-3469, 1994 WL 521119, at *2 (6th Cir. Sept. 23, 1994); *Akbar v. Jago*, No. 84-3540, 1985 WL 13195, at *1 (6th Cir. Apr. 10, 1985); *Roddy v. Black*, 516 F.2d 1380, 1383 (6th Cir. 1975).  And the Supreme Court has repeatedly characterized the Due Process Clause only as barring conviction on the basis of perjury known by the prosecution to be such. *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959)

(emphasis added) ("[I]t is established that a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment."); *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added) (due process is violated by the "*knowing* use of perjured testimony."); *see id.* at 103-04 & nn. 8-9 (discussing cases). At a minimum, "[t]he Supreme Court has never held that due process is offended by a conviction resting on perjured testimony where the prosecution did not know of the testimony's falsity at trial." *LaMothe v. Cademartori*, No. C 04-3395, 2005 WL 3095884, at *5 (N.D. Cal. Nov. 11, 2005) (citing *Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of certiorari) (noting that the Supreme Court has yet to consider the question of whether due process is violated by a conviction based on perjured testimony regardless of the prosecutor's knowledge)); *cf. Briscoe v. LaHue*, 460 U.S. 325, 326 n. 1 (1983) ("The Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer in itself violates constitutional rights.").

### b. Analysis

Petitioner's perjury and intimidation claims are premised on Works's unsworn "affidavit," in which Works states that he committed perjury at trial, as a result of coercion by the prosecutor, in testifying that Burton had made a dying declaration accusing "Maurice" of shooting him. The trial court rejected this claim, on the bases that Works's statement was not credible and there was strong evidence against petitioner even in the absence of Works's testimony. *See* Trial Ct. op. I, at 2-3. As explained above, Works's unsworn recanting statement made years after the trial is simply not credible. Petitioner has identified no corroborating evidence to support Works's recantation, or to support his claim that the prosecutor knowingly presented perjured testimony or intimidated

witnesses.  In the absence of any such evidence, the trial court did not act unreasonably in rejecting these claims, and petitioner is not entitled to habeas relief.

G.      *Fair Cross Section (Claim V)*

In his fifth claim, petitioner contends that he was denied his Sixth Amendment right to a jury drawn from a fair cross-section of the community.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment guarantees a criminal defendant the right to be tried before a jury drawn from a fair cross-section of the community.  *See Duren v. Missouri*, 439 U.S. 357, 359 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 526-31 (1975).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren*, 439 U.S. at 364.  Petitioner bears the burden of establishing each element of the *prima facie* fair-cross section claim, including underrepresentation and systematic exclusion.  *See Berghuis v. Smith*, 130 S. Ct. 1382, 1395 (2010); *Duren*, 439 U.S. at 364.

2.      *Analysis*

The Michigan Court of Appeals rejected petitioner's claim, reasoning that although petitioner met the first two elements of the *prima facie* fair cross-section claim, he could not meet the third element because he relied solely "on the disparity between the number of African-Americans in the Saginaw community and the number that were in his jury array," and "failed to present any evidence regarding Saginaw County's jury-selection process."  *Haynes*, 2009 WL 2136913, at *6.  This

51

determination was reasonable.  As the court of appeals correctly observed, petitioner bases his claim solely on the paucity of African-Americans on the jury venire from which his trial jury was drawn. Even assuming the truth of this assertion, it is insufficient to establish a fair cross-section claim.  It is well established that "[e]vidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion."  *United States v. Horne*, 4 F.3d 579, 588 (8th Cir. 1993); *accord United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001); *United States v. Hill*, 197 F.3d 436, 445 (10th Cir. 1999); *United States v. DeFries*, 129 F.3d 1293, 1301 (D.C. Cir. 1997).  Petitioner has presented no evidence that other venires did not include a fair representation of African-Americans, or that the method used to draw the jury pool was designed to exclude African-Americans.  *See Williams*, 264 F.3d at 568; *United States v. Green*, 742 F.2d 609, 611 (11th Cir. 1984); *Concepcion v. United States*, 181 F. Supp. 2d 206, 227 (E.D.N.Y. 2002).  Further, none of petitioner's argument addresses the reason for the alleged underrepresentation of African-Americans on the jury venire.  It is well established that "[i]f [a distinctive group is] underrepresented on the jury list because of legitimate juror qualifications, . . . then the . . . jury selection system does not unconstitutionally exclude [that group]."  *Davis v. Warden, Joliet Correctional Inst. at Statesville*, 867 F.2d 1003, 1015 (7th Cir. 1989).  For example, the courts are unanimous that a state may draw its jurors using voter registration lists, even when a distinctive group is underrepresented on such lists.  *See id.* (citing cases).  The rationale underlying these cases is that "[d]iscrepancies resulting from private sector influences rather than affirmative governmental action do not reflect the constitutional infirmities contemplated by the systematic exclusion prong of *Duren*."  *United States v. Rioux*, 930 F. Supp. 1558, 1572 (D. Conn. 1995), *aff'd*, 97 F.3d 648, 658 (2d Cir. 1996); *see also*, *United States v. Cecil*, 836 F.2d 1431, 1446-47 (4th Cir. 1988).  Because petitioner has failed to point to any evidence of

systematic exclusion of African-Americans, he is not entitled to habeas relief on this claim.

H.      *Sufficiency of the Evidence (Claim VIII)*

In his eighth claim, petitioner argues that the prosecution presented insufficient evidence to prove his guilt beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Legal Standard*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam).  The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319).  Likewise, a reviewing court "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It

53

is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. As the Court has explained, "the only question under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065.[5]

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 132 S. Ct. at 2064 (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16).

2.     *Analysis*

Petitioner does not challenge the sufficiency of the evidence with respect to any particular element of the offenses for which he was convicted. Rather, petitioner contends that the evidence was insufficient to establish his identity as the perpetrator. The Court should reject this claim.

---

[5]Under the amended version of § 2254(d)(1) a federal habeas court's review is "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). A state court's decision that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference under AEDPA." *Coleman*, 132 S. Ct. at 2065; *see also*, *Cavazos*, 132 S. Ct. at 4. As noted above, *see supra* note 3, because no state court passed on the merits of this claim, § 2254(d)(1) is inapplicable. I thus apply the *Jackson* standard to petitioner's claim *de novo*.

Here, there was significant circumstantial evidence from which the jury could conclude beyond a reasonable doubt that petitioner was the perpetrator. It is undisputed that petitioner was at the scene of the shooting, and spoke with the victim. Petitioner's palm print was found on the victim's car, showing that he approached close enough to have committed the murder. Both the victim in his dying declaration and a witness identified the perpetrator as "Maurice." Contrary to petitioner's testimony that a third person committed the murder and fled on foot, Mirelez testified that he looked out the window when he heard the shots, and saw a man backing away from the victim's car and get into a car later identified as having been rented to petitioner's mother. Mirelez did not see another person. Revels testified that she saw the car rented to petitioner's mother chasing the victim's car into the parking lot. A man she knew as "Maurice" got out of the car, exchanged words with the victim, fired three shots, got back into his car, and fled. She, too, did not see any other person in the parking lot. Thus, the testimony, if believed by the jury, established that the murder was committed by a man named Maurice who was driving a car rented to petitioner's mother and to which petitioner had access, and that there was no other person present at the scene at the time.

The fact that no witness could positively identify petitioner as the shooter does not render the evidence insufficient. "It is well-established that circumstantial evidence alone can be sufficient to support any burden of proof, even where, as in a matter of substantive criminal liability, the prosecution's proof must be beyond a reasonable doubt." *United States v. Jones*, 31 F.3d 1304, 1316 (4th Cir. 1994); *see also*, *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984). "[C]ircumstantial evidence is intrinsically as probative as direct evidence even where the conviction rests solely upon circumstantial evidence." *United States v. Taylor*, 599 F.2d 832, 838 (8th Cir.

55

1979) (citing *Holland v. United States*, 348 U.S. 121 (1954)).  As the Supreme Court explained in

*Holland*:

> Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result.  Yet this is equally true of testimonial evidence.  In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference.  In both, the jury must use its experience with people and events in weighing the probabilities.  If the jury is convinced beyond a reasonable doubt, we can require no more.

*Holland*, 348 U.S. at 140.  Nor is the evidence rendered insufficient because there may have been

some inconsistencies in the testimony of the witnesses.  As noted above, it is well-established that

a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility

determinations in evaluating the sufficiency of the evidence."  *United State v. Owusu*, 199 F.3d 329,

344 (6th Cir. 2000); *Walker v. Russell*, 57 F.3d 472, 475-76 (6th Cir. 1995); *see also*, *United States

v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a

particular witness spoke the truth or fabricated a cock-and-bull story.").  "The fact that the testimony

is contradictory does not mean that evidence is insufficient, only that the jury must make credibility

determinations."  *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995).  It

is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence,

and this Court must presume that the jury resolved those conflicts in favor of the prosecution.  *See

Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).  Finally, the

evidence is not rendered insufficient merely because petitioner can point to alternative explanations

for the murder of Burton.  It is well established that the prosecution's evidence need not rule out

every hypothesis other than petitioner's guilt to be sufficient.  *See Jackson*, 443 U.S. at 326.  This

rule applies equally where the prosecution's case is based solely or principally on circumstantial

evidence.  *See United States v. Ramirez*, 635 F.3d 249, 256 (6th Cir. 2011); *United States v.*

*Ellerbee*, 73 F.3d 105, 107 & n.2 (6th Cir. 1996).

As noted above, the *Jackson* standard does not permit "fine-grained factual parsing" of the evidence by a reviewing court, *Coleman*, 132 S. Ct. at 2064, nor does it permit this Court to reweigh the conflicts in the evidence or assess the credibility of the witnesses. The jury, as the finder of fact, was free to draw any reasonable inferences from the evidence, and to resolve the conflicts in the evidence in favor of the prosecution. In light of the testimony presented at trial, the verdict was not "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.    *Newly Discovered Evidence/Actual Innocence (Claims VII & X)*

Petitioner next contends that he is entitled to habeas relief because the affidavits of Works and Tress establish that he is actually innocent. The Court should reject this claim. A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, the existence of new evidence, standing alone, is not a basis for granting the writ. As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id*. at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317

(1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). Thus, the newly discovered evidence, standing alone, provides no basis for habeas relief. *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007); *Wright v. Stegall*, 247 Fed. Appx. 709, 711 (6th Cir. 2007).[6] Moreover, as explained in connection with the procedural default issue, petitioner has failed to clear the high hurdle of establishing his actual innocence. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

J.      *Ineffective Assistance of Counsel (Claim IX)*

Finally, petitioner contends that his appellate counsel was ineffective for failing to raise his sufficiency of the evidence claim on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

---

[6]In *Herrera* and again in *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court noted that it might be the case that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief," but explicitly declined to determine whether this is, in fact, the constitutional rule. *Herrera*, 506 U.S. at 417; *see also*, *House*, 547 U.S. at 555. This rule affords no basis for relief to petitioner, however. First, as *Herrera* makes clear this rule is limited to the context of executing an innocent person, and has no applicability in a non-capital case. *See Hodgson v. Warren*, 622 F.3d 591, 601 (6th Cir. 2010); *Wright*, 247 Fed. Appx. at 711. Second, because the Supreme Court has recognized that the question whether there exists a "federal constitutional right to be released upon proof of 'actual innocence' . . . is an open question," *District Attorney's Office for the 3d Jud. Dist. v. Osborne*, 129 S. Ct. 2308, 2321 (2009), a state court's failure to grant relief on the basis of actual innocence cannot be contrary to or an unreasonable application of any clearly established federal law under § 2254(d)(1). *See Reyes v. Marshall*, No. CV 10-3931, 2010 WL 6529336, at *3 (Aug. 23, 2010), *magistrate judge's report adopted*, 2011 WL 1496376 (C.D. Cal. Apr. 14, 2011). *See generally*, *Murdoch v. Castro*, 609 F.3d 983, 994 (9th Cir. 2010) (state court's failure to grant relief on basis which Supreme Court has recognized is an open question cannot be unreasonable application of clearly established law); *Smith v. Hofbauer*, 312 F.3d 809, 817 (6th Cir. 2002) (same).

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same). As the Supreme Court has recently

explained, *Strickland* establishes a high burden that is difficult to meet:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).[7]

With respect to appellate counsel, it is well established that "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing

---

[7]As with review of a sufficiency of the evidence claim, a habeas court's review of an ineffective assistance claim under § 2254(d)(1) is "doubly" deferential. *See Harrington*, 131 S. Ct. at 788. Here, however, the deferential standard set forth in § 2254(d)(1) is inapplicable because no state court addressed petitioner's ineffective assistance claim on the merits. *See supra* notes 3, 6.

*Jones v. Barnes*, 463 U.S. 745 (1983)).  Although it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Id.*  As a general rule, it is "'only when ignored issues are clearly stronger than those presented [that] the presumption of effective assistance of counsel [can] be overcome.'" *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  Further, in the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal.  *See id.* at 285-86; *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).

2. *Analysis*

Here, petitioner cannot show that counsel was ineffective for failing to raise his sufficiency of the evidence claim on direct appeal.  Counsel raised a number of significant challenges to petitioner's conviction on appeal, including claims challenging the principal evidence admitted against petitioner.  As explained above, petitioner's sufficiency of the evidence claim is without merit.  Thus, petitioner cannot show that this claim was obviously stronger than the claims raised by counsel, nor that he was prejudiced by counsel's failure to raise this claim on appeal.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

K. *Recommendation Regarding Certificate of Appealability*

1. *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing

61

of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.""' *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of

Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

    If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability.  As explained above, petitioner's claim that the trial court improperly admitted evidence of a prior inconsistent statement does not raise a federal constitutional claim cognizable on habeas review, and thus the resolution of this claim is not reasonably debatable.  Further, it is clear that the trial court properly excluded the evidence petitioner sought to introduce, and that this exclusion did not infringe a weighty interest of petitioner.  Thus, the resolution of petitioner's claim that he was denied his right to present a defense is not reasonably debatable.  Because the victim's statement identifying the shooter as Maurice was not testimonial hearsay, and because the statement was a dying declaration, the resolution of petitioner's confrontation claim is not reasonably debatable.  For the reasons explained above, petitioner has failed to show that the prosecutor made any improper argument or impermissibly commented on his exercise of his right to remain silent, and thus the resolution of these prosecutorial misconduct claims is not reasonably debatable.  Further, because Works's purported affidavit is not credible evidence that the prosecutor suborned perjury or intimidated Works, the resolution of these claims is not reasonably debatable.  With respect to petitioner's fair cross-section claim, petitioner has failed to point to any evidence that the Saginaw

County jury selection system results in a systematic exclusion of African-Americans from the jury pools, and thus the resolution of this claim is not reasonably debatable. Because the testimony of the witnesses provided sufficient circumstantial evidence to establish petitioner's identity as the perpetrator, the resolution of petitioner's sufficiency of the evidence claim, and of his related ineffective assistance of appellate counsel claim, is not reasonably debatable. Finally, because it is clear that a claim of actual innocence based on newly discovered evidence does not state a cognizable claim for habeas relief, the resolution of this claim is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

L.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health*

64

*& Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Date: April 16, 2014                                    s/Paul J. Komives
                                                        PAUL J. KOMIVES
                                                        UNITED STATES MAGISTRATE JUDGE


**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on April 16, 2014.


                                                        s/ Kay Doaks
                                                        Case Manager

65